IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States | : | |
| | : | Case No. C-1-00-637 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER RULING ON MOTIONS |
| Daniel Green *et al.* | : | FOR SUMMARY JUDGMENT |
| | : | AS TO LIABILITY |
| Defendants | : | |

This matter comes before the Court on Defendant Saundra Green's Motion for Summary Judgment (doc. #42), Defendant L.W.G. Co., Inc. f/k/a Green Industries Inc.'s Motion for Summary Judgment (doc. #43), Defendant Hard Surface Technology, Inc.'s Motion for Summary Judgment (doc. #44), the United States' Motion for Partial Summary Judgment Against L.W.G. Co., Inc., Daniel Green, and the Estate of Maurice Green (doc. #46), and the United States' Motion for Partial Summary Judgment Against Hard Surface Technology as the Successor-in-Liability to L.W.G. Co., Inc. / L.W.G. Finishing Corp. (doc. #47). For the reasons set forth below, the Court **DENIES** Saundra Green's motion for summary judgment (doc. #42), **DENIES** LWG Co., Inc.'s motion for summary judgment (doc. #43), **GRANTS** Hard Surface Technology, Inc.'s motion for summary judgment (doc. #44), **GRANTS IN PART, DENIES IN PART AND HOLDS IN ABEYANCE IN PART** the United States' motion for partial summary judgment against L.W.G. Co., Daniel Green and the Estate of Maurice Green (doc.

#46), and **DENIES** the United States' motion for partial summary judgment against Hard Surface Technology, Inc. (doc. #47).

## I.    FACTUAL BACKGROUND

This is a civil action brought by the United States under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), found at 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, and pursuant to the Federal Debt Collections Procedure Act ("FDCPA"), 28 U.S.C. §§ 3001 et seq.  The United States seeks to recover costs that it incurred in cleaning up hazardous substances at a site formerly owned by Green Industries, Inc. and located at 3603 East Kemper Road in Sharonville, Ohio ("the Site").   The defendants are Daniel Green ("Daniel"), the estate of Daniel's father, Maurice Green ("Maurice") ("the Estate"), L.W.G. Co., Inc. (formerly known as Green Industries, Inc.) ("LWG") and Hard Surface Technology, Inc. ("HST").   Additionally, the United States has joined Daniel's wife, Saundra Green ("Saundra"), as a necessary party pursuant to Rule 19 of the Federal Rules of Civil Procedure.

## A.    History of Green Industries and its Plating Operation on the Site

This case involves a convoluted history of various entities in which the Green family has had an interest.  In 1963, Norwood Hard Chrome ("NHC1") was incorporated, with Maurice and Dorothy Green and Richard Franklin elected as directors.  In 1969, NHC1 changed its name to Green Industries, Inc. ("Green Industries").  In 1972, Maurice and Daniel were elected directors of Green Industries.  Initially, Maurice was the majority shareholder.   By 1978, however, Daniel

was the majority shareholder. (See ex. 3[1] at 3.) In 1979, Daniel became the vice president and secretary of Green Industries. On June 10, 1982, Daniel was elected president and treasurer of Green Industries, and Maurice was elected vice president and secretary. (See id.) However, Daniel testified that his duties and responsibilities did not change when he rose from the position of vice president to that of president. (See D. Green dep. at 20.)

Meanwhile, Maurice personally purchased the Site and there began operating an electroplating operation through Creutz Plating Co. ("Creutz"). In the early 1980s, Maurice sold the Site to Creutz and consolidated the operations of Green Industries and Creutz at the Site. On May 15, 1987, the directors of Green Industries approved a merger of Creutz into Green Industries.

Both Maurice and Daniel Green were involved in the day-to-day operations of plating on the Site. Maurice Green acquired equipment, laid out the plating lines, plumbing and drains, established parameters for the plating operations, and served as a "trouble-shooter" for any plating problems. (See id. at 46-47.) According to his own testimony, Daniel supervised and acted as "a plant manager" of the hard chrome plating, anodizing and sand blasting departments. (Id. at 20-21.) Daniel's responsibilities included scheduling jobs, talking to customers, making sales calls, supervising quality control, scheduling deliveries, and purchasing raw materials and tooling. (See id.) In his testimony Daniel disclaimed any responsibility for maintaining the corporate books or scheduling directors' or shareholders' meetings. (See id. at 21.) However,

---

[1]For the sake of brevity, unless otherwise indicated, exhibit numbers refer to exhibits attached to the declaration of Jeffrey A. Spector, filed in support of the United States' motions for summary judgment and attached to document number 47.

Daniel had authority to sign checks on behalf of both Creutz and Green Industries in Maurice's absence.  (See id. at 47.)

However, there is also evidence that even after Daniel became president of Green Industries Maurice remained the dominant force and ultimate-decision maker at Green Industries.  Several former employees and business associates of the Green family and its entities testified that Maurice had a dominating personality.  (See Grinstead dep. at 202; Wagers dep. at 49-50; Schulte dep. at 64, 69.)  Such witnesses also testified that Maurice was the boss at Green Industries.  (See Wagers dep. at 48-49; Schulte dep. at 64; Hoyle dep. at 53-54; Harris dep. at 82.)  In particular, Maurice made hiring decisions.  (See Wagers dep. at 48-49.)  Maurice controlled the books and the corporate finances and made all major purchasing decisions.  (See Wagers dep. at 49.) An accountant who did work for the Greens testified that, in contrast, Daniel had minimal input into business decisions.  (See Schulte dep. at 64, 69.)  A former Green Industries bookkeeper testified that, at least with respect to hiring decisions, Daniel "did what his dad told him."  (Wagers dep. at 48-49.)

**B.    Environmental Problems at the Site**

In their plating operations, Creutz and Green Industries used various potentially hazardous substances, including cyanide, caustic acid, chromic acid, hydrochloric acid, hydrofluoric acid, nitric acid, phosphoric acid, sulfuric acid, hexavalent and trivalent chromium, cadmium, chromate, chrome, copper, nickel, phosphates, silver, tin, zinc and caustic cleaners.  (See ex. 12 at 2-4.)  During the time that Creutz and Green Industries performed plating on the Site, some of these substances leaked or were released into the ground:

- Fans designed to exhaust condensed chrome fumes from the hard chrome plating tanks cracked, leading chrome to leak from the bottom of the fans onto the ground.  (See D. Green dep. at 117-26.)

- Employees regularly poured waste acids down a floor drain directly into the sanitary sewer of the Metropolitan Sewer District of Greater Cincinnati ("MSD") during the late 1970s and early 1980s, although Daniel testified that employees would wait until they had both a cleaner and an acid to be emptied and then mix them together to "neutralize" them before they were poured down the drain.  (See id. at 51-52.)

- Chrome-contaminated storm water drained into the storm sewer through outdoor grates running along the south side of the Site and through the shipping dock floor drain; eventually the storm water discharged untreated into the drainage ditch running along the eastern edge of the Site.  (See id. at 75-83; ex. 37.)

- On multiple occasions, Creutz and Green Industries employees disposed of waste acids, including combinations of silver, arsenic, barium, cadmium, cyanide, chromium, copper, mercury, nickel, lead, low-pH sulfuric acid, selenium and zinc, into a pit behind the plant building.  (See exs. 39-41.)

- Contaminated water spilled from the hard chrome tanks on multiple occasions.  (See D. Green dep. at 87-92.)  Cracks in the floor of the plant permitted spilled substances to reach the ground below the floor.  (See id. at 147; Dedden dep. at 77-78.)

- Sumps servicing the hard chrome plating tanks lacked concrete bottoms and emptied directly into the ground.  (See D. Green dep. at 90-91.)

- The hard chrome tanks leaked on multiple occasions.  (See Hoyle dep. at 35-36, 65; Dedden dep. at 17-19; Emo dep. at 24-25.)

- During a July 22, 1987 inspection of the Site, the Ohio Environmental Protection Agency ("Ohio EPA") identified two drums leaking zinc cyanide.  (See ex. 53.)

The United States points to several specific ways in which Daniel personally participated in activities related to hazardous materials:

- Both Daniel and Maurice frequently communicated with the United States Environmental Protection Agency ("US EPA"), the Ohio EPA and the United States Occupational Safety and Health Administration ("OSHA"), both in person and by letter, in the mid-1980s.  (See exs. 26, 27, 29-33, 36, 37, 43-44, 55-59, 61-67.)

5

- Although he was not the person primarily tasked with the job, occasionally Daniel would check and empty the pans that were placed under the leaking chrome blowers. (See id. at 126-27.) Daniel also supervised the construction of an asphalt berm around and a shed over the area where the chrome was being caught under the blowers. (See id. at 127-28; Hoyle dep. at 53-54.)

- In August 1985, Daniel received a telephone call from a neighboring property owner, Durkee's Famous Foods, informing him that acid was draining from the Site onto Durkee's property. Daniel instructed Al Flay to give Durkee soda ash with which to "neutralize" the leak. (Id. at 102-05.)

- Daniel signed off on the March 14, 1986 letter to the Ohio EPA submitting the plan for closure of the waste disposal pit on the Site as prepared by Green Industries' environmental consultants, Dames & Moore. (See id. at 110-11; ex. 44.) Daniel also worked with Dames & Moore during their consultation, showing them around the Site and discussing with them possible ways to contain or remove hazardous waste. (See D. Green dep. at 202-09; exs. 47-49.)

- As part of Daniel's daily routine, he would look down into the sump in the hard chrome department to make sure that the sump was dry. (See D. Green dep. at 89-92.)

There is also evidence in the record that suggests that Daniel did not exercise independent decision-making authority in taking some of these particular actions. James Hoyle, a former Green Industries employee and Maurice's stepson, testified that building a shed over and a berm around the area where chrome was caught under the blowers was "probably" Maurice's idea. (Hoyle dep. at 53-54.) With respect to the incident where acid leaked onto the Durkee property, Daniel testified that while it was his decision to send over soda ash, he thought that this was merely a way to contain the spill until Maurice returned to the Site – "I was going to wait until my dad got back because I didn't have a clue. I wasn't aware of the pit until that point when Al told me what it was." (D. Green dep. at 104-05.) Daniel also testified that if Dames & Moore was on Site, his father was with them the whole time, while Daniel was seldom present. (See id. at 206.) Additionally, Daniel testified that while he recognized his signature on

6

much of the correspondence to governmental environmental agencies, he did not recall the

letters, and someone else must have written the letters for him.  In particular, he testified that he

had signed the March 14, 1986 letter regarding closure of the pit despite having had no

involvement in the drafting of the letter or the issues discussed therein.  (See id. at 110-13.)

Finally, an Ohio EPA inspector testified that Don Thurman and Al Flay, not Daniel Green, made

the day-to-day decisions regarding waste disposal and were the Site's main environmental

contacts.  (See Combs dep. at 14, 48.)

In 1998, Green Industries sold the Site to H.R.W. Industries Inc. ("HRW"), which later

changed its name to Green Industries Corp. ("GIC") and was owned by three persons without

any apparent familial relation to the Greens: Bernard Harris, Don Rex and Al Wagers.  One of

those acquirers, Mr. Harris, testified that as part of the asset purchase, Green Industries

transferred hundreds of drums of chemicals to GIC.  (See Harris dep. at 49-50.)  According to

Mr. Harris' testimony, GIC used some of the chemicals but not others, and much of the

chemicals were "waste," "[s]pent solutions" that had been placed into drums.  (Id. at 50.)  Daniel

also offered testimony suggesting that his company never cleaned out "sludge" that developed in

the hard chrome tanks at the Site prior to transferring ownership to HRW because it never

accumulated sufficiently as to interfere with the plating process.  (See D. Green dep. at 36-37.)

GIC ceased operations on the Site in the mid-1990s.


### C.     LWG Finishing, HST and Omni

7

After selling the Site, Green Industries promptly changed its name to LWG Co., Inc. and purchased property at 9461 Le Saint Drive in Fairfield, Ohio (the "Le Saint Drive Property") with the proceeds from the sale of the Site. LWG also acquired an interest in a company called Norwood Hard Chrome Co. ("NHC2"), initially owned by Daniel and Maurice and later renamed LWG Finishing Corp. ("LWG Finishing"). LWG Finishing owned equipment and assets related to the operations at the Le Saint Drive Property. LWG Finishing leased from LWG a parcel of the Le Saint Drive Property, while Stamping Technologies, one of Maurice's other companies, leased another parcel. In February 1993, LWG transferred all of its ownership interest in LWG Finishing to Maurice (80 shares), Daniel (80 shares), Frank McFarland (20 shares) and Ray Acree (20 shares) for no consideration other than past services rendered. (See ex. 3 at 4; ex. 74 at 12; D. Green dep. at 231-34.)

In January 1994, Daniel and Messrs. McFarland and Acree incorporated Defendant Hard Surface Technology, Inc. ("HST"), with Daniel having 80 percent ownership interest. In February 1994, LWG Finishing sold its assets to HST. Daniel executed the asset purchase and sales agreement on behalf of both HST and LWG Finishing, as president of both companies, and only one attorney and one accountant worked on the transaction. (See D. Green dep. at 277-78, 377; ex. 97.) The assets sold included equipment and furniture, accounts receivable and intangible assets, including the name "LWG Finishing." (See ex. 97.) As consideration for the assets, HST agreed to 1) assume a $200,000 November 3, 1993 promissory note from LWG Finishing to Daniel's wife, Saundra, 2) pay LWG $50,000 on behalf of LWG Finishing, and 3) assume LWG Finishing's accounts payable. (See id.) HST retained most of LWG Finishing's former employees, serviced the same customers, and continued to use the trade name "LWG

Finishing."  (See D. Green dep. at 279-80, 286; Grinstead dep. at 193-94.)  Although Maurice

was not a shareholder or officer of HST, he continued to draw a salary, serving such roles as

truck driver and technical advisor.  (D. Green dep. at 338.)

Two months after LWG Finishing sold its assets to HST, LWG sold its sole remaining

asset, the Le Saint Drive Property, to Omni Industrial Properties, Inc. ("Omni"), incorporated

shortly before the sale by Daniel's brother, Samuel Green ("Sam").  (See D. Green dep. at 305-

07.)  In June 1999, LWG filed a certificate of dissolution.  Maurice passed away on December

29, 1999.  HST continues to operate a finishing operation at the Le Saint Drive Property under a

lease with Omni.

### D.    Governmental Actions

In 1995, shortly after GIC ceased operations on the Site, the US EPA assessed the Site

for environmental problems.  In its assessment, the US EPA identified abandoned and

deteriorating plating lines containing chemical and plating wastes and abandoned and

deteriorating drums containing acids, chemicals and waste sludge.  (See ex. 69 at EPA 001182,

001185-86.)  Inspectors also identified the interior walls, concrete flooring and sewer system of

the abandoned and deteriorating main building as being contaminated by hazardous substances.

(See id. at EPA 001174.)  Through a contractor, the US EPA conducted various contamination

removal activities between March 1996 and August 1997.  (Id.)

The United States instituted this action on August 4, 2000, naming Daniel, LWG and the

Estate as Defendants.  (Doc. #1.)  Daniel was named both personally and in his capacity as

representative of the Estate.  On October 16, 2000, the United States amended its complaint,

adding Saundra as a defendant under Federal Rule of Civil Procedure 19 and alleging that Daniel

had transferred assets to Saundra when Daniel knew or should have known that he may be held liable for costs incurred by the United States in the cleanup of the Site.  (Doc. #2 ¶¶ 35-36.)  With leave of Court and no opposition from Defendants, the United States filed a Second Amended Complaint on January 7, 2002, adding HST as a defendant.  (Doc. #28.)  In the interim, the Court entered case management orders proposed by the parties.  (Docs. ## 21, 34.)  Under those orders, discovery was trifurcated into liability ("Phase I"), costs ("Phase II") and assets ("Phase III") phases, with discovery on costs and assets stayed pending resolution of issues of liability.  Pursuant to the more recent of those case management orders, the parties filed motions for summary judgment, purportedly on issues of liability.  The United States has moved for partial summary judgment with respect to its claims against LWG, Daniel, the Estate and HST.  Saundra, LWG and HST each have moved that summary judgment be entered in their favor.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

## III.    ANALYSIS

The United States brings this action under section 107 of CERCLA, found at 42 U.S.C. § 9607.  The purpose of CERCLA is to facilitate the prompt remedial clean-up of hazardous waste sites by assessing the costs of the cleanup to the persons found to be responsible for the presence of the hazardous substances.  See Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing United States v. R.W. Meyer, 889 F.2d 1497, 1500 (6th Cir. 1989)).  To establish a prima facie case of liability under section 107 of CERCLA, the United States must show that 1) there was a release or threatened release of a hazardous substance; 2) the site of the release or threatened release is a "facility" as that term is defined in the statute; 3) the release or threatened release has caused the United States to incur response costs; and 4) the alleged tortfeasor is among a statutorily defined group of persons.  42 U.S.C. § 9607(a); Kalamazoo River Study Group, 171 F.3d at 1068.  Persons who may be found liable under CERCLA, sometimes referred to as potentially responsible parties ("PRPs"), include:

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a).

11

The United States bears the burden of establishing a prima facie case under section 107(a) when seeking to recover the costs of an EPA clean-up. <u>Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.</u>, 153 F.3d 344, 347 (6th Cir. 1998). If the prima facie case is met, then "[l]iability for cost recovery actions brought against PRPs under section 107(a) is strict." <u>Id.</u> at 348. That is, the United States need not prove that a PRP is at fault for the hazardous substance incident requiring the clean-up or that a PRP is responsible for a certain share of the United States' response costs. <u>See id.</u> The United States need establish only that the PRP is "liable" under the statute.

Section 9067(a) begins with the following prefatory language: "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section . . . ." According to the clear language of the statute, therefore, PRPs against whom a prima facie case of liability is established can avoid the strict liability imposed under § 9067(a) only by establishing one of the enumerated defenses in § 9067(b). Section 9067(b) provides as follows:

> There shall be no liability under subsection (a) for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by–
> (1) an act of God;
> (2) an act of war;
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all the relevant facts and circumstances, and (b) he took precautions against foreseeable acts

> or omissions of any such third party and the consequences that
> could foreseeably result from such acts or omissions . . . ."

42 U.S.C. § 9607(b).

Because the liability of each Defendant is implicated by the motions for summary judgment, the Court will address the motions by taking each Defendant in turn.

### A.    Estate of Maurice Green

The United States has moved for summary judgment that the Estate is liable under CERCLA section 107(a)(2), codified at 42 U.S.C. § 9607(a)(2), as an operator of the Site at the time of release or disposal of hazardous substances at the Site.  (Doc. #46.)  The Estate has not responded to the United States' motion.  The complaint alleges that Daniel is the personal representative of the Estate, and Daniel has filed a response to the United States' motion for summary judgment through counsel that represents him personally.  However, in his response Daniel does not argue that the Estate is not liable but merely that Daniel is not personally liable.  The Estate and Daniel as representative of the Estate are represented by different counsel than that which represents Daniel personally, and the Estate's counsel has filed no responses to the United States' motion for summary judgment.  Therefore, the Court will order the Estate to show cause why the United States' motion for summary judgment should not be granted with respect to the Estate's liability.

### B.    Daniel Green

The United States also seeks judgment that Daniel is liable under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2), as an operator of the Site at the time of release or disposal of hazardous substances at the Site.  (Doc. #46.)  Daniel contends that the United States has not met its burden of demonstrating as a matter of law that he was an operator of the Site.

13

The definition of "operator" found in the CERCLA statute – "any person . . . operating [a

covered] facility,"42 U.S.C. § 9601(20(A)(ii) – is "tautological" and thus "not very helpful."

See United States v. Township of Brighton, 153 F.3d 307, 314 (6th Cir. 1998).  Thus, the

Supreme Court and the Sixth Circuit have applied the "ordinary" meaning of the term

"operator."  See United States v. Bestfoods, 524 U.S. 51, 66 (1998), cited in Township of

Brighton, 153 F.3d at 314.  The Supreme Court noted that while the term "operate" might mean

"[t]o control the functioning of," as in "to operate" a sewing machine, in using that term in

CERCLA, Congress "more obviously intended" the word to be used "in the organizational

sense," as in "[t]o conduct the affairs of; manage: *operate a business*."  Id. (emphasis in

original).  Congress "obviously meant something more than mere mechanical activation of

pumps and valves," and the statute "must be read to contemplate 'operation' as including the

exercise of direction over the facility's activities."  Id. at 71.  Thus, under CERCLA, an

"operator" is "someone who directs the workings of, manages, or conducts the affairs of a

facility."  Id. at 66.  More specifically with respect to environmental contamination, "an operator

must manage, direct, or conduct operations specifically related to pollution, that is, operations

having to do with the leakage or disposal of hazardous waste, or decisions about compliance

with environmental regulations."  Id. at 66-67.

Relying on Justice Souter's comment that "even a saboteur who sneaks into the facility at

night to discharge its poisons out of malice" may be liable as an operator, id. at 65, the United

States contends that a person need not have exercised control and discretion over an entire site,

or any portion of a site, in order to incur liability for the release or threatened release of

hazardous substances that occurred at the site.  However, other language in the Bestfoods

14

opinion suggests that "mere mechanical activation of pumps and valves" is insufficient to subject

oneself to liability and that, instead, a court should apply the term "operator" not in the sense of

"operating" a sewing machine, but in the organizational sense, as in "operating" a business.

Moreover, the United States points to no case, and the Court can find none, where a defendant is

subject to operator liability merely based on his day-to-day participation in the work of a facility

or the disposal of hazardous substances without having ultimate decision-making control over

the facility in question or any part thereof.[2]  Without case law support, the Court cannot find that

a person who is physically involved in the day-to-day operations of the facility but who does not

have any ultimate decision-making authority can be subject to operator liability under CERCLA.

Daniel Green has pointed to sufficient evidence to create an issue of material fact

precluding awarding the United States summary judgment on its claim against him.  The fact that

Daniel ultimately was president and majority shareholder of the company gives rise to an

---

[2]The more typical question is whether an executive who undisputedly has decision-making control over the company operating the facility is sufficiently involved in the disposal of hazardous substances such that he may be personally liable as an operator.  See, e.g., Browning-Ferris Indus. of Ill., Inc. v. Ter Maat, 195 F.3d 953, 955-56 (7th Cir. 1999) (president and principal shareholder of corporations that operated facility also personally liable where he supervised the day-to-day operations of the landfill); United States v. Jones, 267 F. Supp. 2d 1349, 1355-56 (M.D. Ga. 2003) (president of company that owns oil processing facility liable as operator under Oil Pollution Act, applying CERCLA definition of "operator," where he was primary decision-maker over the facility's compliance with environmental regulations); Aero-Motive Co. v. Becker, No. 1:99-CV-384, 2001 WL 1699191, at *6 (W.D. Mich. Oct. 2, 2001) (plaintiff could not obtain summary judgment on issue of whether directors and forty percent shareholders of company that owned site were liable as operators, where directors presented evidence that they never directed anyone regarding waste disposal and left day-to-day plant operations to other employees), reconsidered in part on other grounds, 2001 WL 1699194 (Dec. 6, 2001); Norfolk S. Ry. Co. v. Gee Co., No. 98 C 1619, 2001 WL 710116, at *19-20 (N.D. Ill. June 25, 2001) (chair of board of directors of company that operated wood treatment facility not subject to operator liability since no evidence that he was heavily and personally involved in the construction and maintenance of the facility but merely authorized capital expenditures, both those related to environmental improvement and those that were not).

inference that he exercised decision-making authority over the business of Green Industries and its plating operation on the Site.  However, Daniel has provided evidence sufficient to create an issue of fact as to whether he had decision-making authority or merely did his father's bidding. The United States specifically has pointed to evidence that Daniel was responsible for monitoring the flow of hazardous substances and may have directed unsuccessful attempts to contain those substances.  However, Daniel has presented evidence that these actions were done at his father's direction.  As Daniel has raised a genuine issue of material fact regarding his decision-making authority at the Site, the Court will deny the United States' motion for summary judgment as to Daniel Green's personal liability.

### C.    L.W.G. Co., Inc.

The United States argues that, as successor-by-merger to Creutz and in its own right as the company formerly known as Green Industries, LWG is liable as an owner or operator and as an arranger of the disposal of hazardous substances.  Before considering the United States' motion for summary judgment on LWG's liability, however, the Court first will consider LWG's motion for summary judgment on the ground that it is "dead and buried" and thus not a "person" subject to suit under CERCLA.

### 1.    Liability as a "dead and buried" corporation

LWG contends that it sold its last asset in April 1994 and was dissolved in June 1999. Citing, inter alia, Stychno v. Ohio Edison Co., 806 F. Supp. 663 (N.D. Ohio 1992), and AT & T Global Information Solutions Co. v. Union Tank Car Co., 29 F. Supp. 2d 857 (S.D. Ohio 1998), LWG argues that a dissolved corporation without assets is not a "person" subject to suit under CERCLA.  The United States argues that the theory that a "dead and buried" corporation may

not be subject to suit under CERCLA is antithetical to the broad remedial scope of CERCLA and that, even if the Court embraced such a theory, granting LWG summary judgment at this stage of the litigation would be premature, since the Court has stayed discovery on issues of assets.  The United States represents that it will seek to prove that the conveyance of the Le Saint Drive property to Omni was fraudulent, and, therefore, LWG still has assets.

Rule 17(b) of the Federal Rules of Civil Procedure provides that the capacity of a corporation to be sued shall be determined by the law under which it was organized.  Fed. R. Civ. P. 17(b).  Some courts have applied this rule in the CERCLA context, applying state corporations law that prohibits suit against a dissolved corporation.  See, e.g., Levin Metals Corp. v. Parr-Richmond Terminal Co., 817 F.2d 1448 (9th Cir. 1987) (applying California corporations law).  Others, including district courts sitting in this state, however, have concluded that, given CERCLA's language that enumerated parties "shall be liable" "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of" § 9607, CERCLA preempts state law on the capacity of corporations to be sued as applied pursuant to Rule 17(b).  See, e.g., Stychno, 806 F. Supp. at 668-69.  Among those courts that have concluded that CERCLA preempts state capacity laws, some have applied a sort of federal common law rule that a corporation otherwise liable under CERCLA may escape liability only if the corporation is both dissolved and lacks assets ("dead and buried").  See id. at 670 (denying third-party defendant's motion to dismiss as to third party plaintiff's CERCLA claim; third-party defendant's articles of incorporation had been cancelled for failure to pay taxes, but third-party defendant produced little evidence that corporation was dead, and no evidence that it was buried).  The reason for excluding dead and buried corporations from the definition of "person"

under CERCLA is that any judgment entered against a corporation that holds no assets would be "futile." Id.

Under Ohio law, dissolution would not immunize LWG from suit. At Ohio common law, the dissolution of a corporation abated all litigation to which the corporation was a party. See Chadwick v. Air Reduction Co., 239 F. Supp. 247, 250 (N.D. Ohio 1965). However, by statute Ohio has prolonged the life of corporations beyond dissolution for litigation purposes. See id. Section 1701.88 of the Ohio Revised Code provides in part:

> (A) When a corporation is dissolved voluntarily . . . the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, or to obtain reinstatement of the articles . . . or are permitted upon reinstatement . . . and for such purposes it shall continue as a corporation.
>
> (B) Any claim existing or action or proceeding pending by or against the corporation or which would have accrued against it may be prosecuted to judgment, with right of appeal as in other cases, but any proceeding, execution, or process, or the satisfaction or performance of any order, judgment, or decree, may be stayed as provided in 1701.89 of the Revised Code.

Ohio and federal courts alike have construed subsection (B) as permitting suits against dissolved corporations, at least for pre-dissolution torts, even where suit is not brought prior to dissolution. See Chadwick, 239 F. Supp. at 251; Cay Machine Co. v. Firestone Tire & Rubber Co., 175 Ohio St. 295, 194 N.E.2d 425 (Ohio 1963); Builders v. Huntington Nat'l Bank, No. 78442, 2001 WL 777011, at *3 (Ohio Ct. App. July 5, 2001); Octavia Coal Co. v. Cooper T. Smith Corp., No. 00CA00223, 2001 WL 704465, at *2 (Ohio Ct. App. June 15, 2001).

The Court concludes that CERCLA does not preempt Ohio corporations law as applied pursuant to Rule 17. Decisions finding preemption have been grounded in the fact that

CERCLA provides that a defendant "shall be liable" "[n]otwithstanding any other provision or rule of law." 42 U.S.C. § 9607(a). Ohio law on the liability of dissolved corporations would not preclude a finding that LWG is liable in this case. Thus, regardless of whether Rule 17 or Ohio corporations law is the sort of "other provision or rule of law" that should be disregarded in favor of CERCLA liability, LWG "shall be liable" if it falls into one of the enumerated categories of liable persons. Having found that CERCLA does not preempt Ohio corporations law here, there is no need to apply any rule that "dead and buried" corporations are not "persons" amenable to suit under CERCLA or any other rule of federal common law.

### 2.    "Owner or operator" and "arranger" liability

Having concluded that LWG may not escape liability on the ground that it is dissolved and has no assets, the Court next considers whether LWG falls into one of the enumerated categories of liable persons. Moving for summary judgment, the United States contends that LWG is liable as a matter of law both as an owner or operator of the Site and as an arranger of the disposal of hazardous substances. LWG concedes that, were it not "dead and buried," it would be liable as an "owner." However, it disputes that it is liable as an "arranger." LWG posits that the United States seeks a determination that LWG is liable as an arranger because if LWG is liable as an arranger because it left hazardous wastes and/or other solutions behind on Site when it gave possession of the Site to HRW, then the United States can more easily argue that LWG "is liable for HRW's portion" of the United States' damages. (Doc. #52 at 9 n.5.) LWG asserts that this theory is "flawed" because even if LWG were liable as an arranger, it could still argue that damages are divisible between it and HRW. (Id.) More generally, LWG argues that even if the Court grants summary judgment for the United States on the issue of

LWG's liability, LWG should still be able to assert divisibility of liability after further discovery. The United States responds that since LWG has conceded ownership liability, the question of arranger liability is superfluous.  In response to LWG's request to delay a finding of joint and several liability, the United States contends that the Court should find LWG jointly and severally liable for the government's clean-up costs now.  LWG having conceded that, were it not "dead and buried," it would fall within at least one of the classes of persons that are liable under CERCLA, and the United States having agreed that the question of arranger liability is thus superfluous, the Court need not determine whether LWG is an "arranger" as a matter of law. The sole question remaining for the Court is whether LWG's liability as an owner is joint and several.

### 3.    Joint and several liability

As explained, <u>supra</u>, once the prima facie case is established, liability for cost recovery actions brought against PRPs under § 9607(a) is strict – that is, the United States need not prove that a PRP is at fault for a particular incident requiring clean-up in order to recover clean-up costs.  <u>Centerior Serv. Co.</u>, 153 F.3d at 348.  Additionally, liability under CERCLA § 9607(a) can be joint and several regardless of fault.  <u>See id.</u> at 348.  PRPs can defeat the imposition of joint and several liability only by affirmatively demonstrating that the harm is divisible.  <u>See id.</u> Joint and several liability under CERCLA is "to be determined in accordance with 'traditional notions and evolving principles of common law.'"  <u>R.W. Meyer, Inc.</u>, 889 F.2d at 1507 (quoting <u>United States v. Chem-Dyne Corp.</u>, 572 F. Supp. 802, 808 (S.D. Ohio 1983)).  Relevant evidence that might help establish divisibility would include "proof disclosing the relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous

wastes at the site." United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir. 1993). However, "[g]iven the nature of hazardous waste disposal, rarely if ever will a PRP be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm." Centerior Serv. Co., 153 F.3d at 348.

Despite shouldering the burden of proving divisibility, LWG has put forth no affirmative evidence that the harm that the United States remedied in this case is divisible. Instead, LWG merely asks for further opportunity to prove divisibility in "Phase II" of these proceedings. However, the issue of joint and several liability is properly contemplated at this stage in the litigation, as it is an issue of liability. As the party seeking to defeat a motion for summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, LWG must demonstrate how the opportunity to conduct additional discovery would enable it to rebut the motion. See Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 409 (6th Cir. 1998). Bare allegations or vague assertions of need without supporting proof are insufficient. See id.; Simmons Oil Corp. v. Tesoro Petroleum Corp., 86 F.3d 1138, 1144 (Fed. Cir. 1996). Therefore, because LWG has not put forward any affirmative evidence that the harm at the Site was divisible, and because LWG has not specified how further discovery might provide evidence that the harm was divisible, the Court holds that LWG is jointly and severally liable for the response costs incurred by the United States at the Site. The Court is willing to revisit this issue during the costs stage of litigation ("Phase II") if and only if additional, relevant evidence regarding the divisibility of harm comes to light during the deferred discovery period on response costs.

### D.    Hard Surface Technologies

HST and the United States have filed cross motions for summary judgment on the issue of HST's liability. HST argues that it is entitled to summary judgment on the ground that the United States' claim against it is time-barred. Alternatively, HST moves for summary judgment on the ground that it is not the successor to LWG's environmental liabilities. Because the Court finds that HST is entitled to summary judgment on the ground that it is not LWG's successor in liability as a matter of law, the Court need not consider the issue of whether the United States' claim against HST is time-barred.

The United States contends that HST is liable under section 107(a) of CERCLA because HST is the corporate successor of LWG and LWG Finishing. LWG and LWG Finishing were so intertwined and under the control of the Green family, argues the United States, that they should be viewed as alter egos as a matter of law. The United States then argues that when LWG Finishing transferred its operating assets and business to HST, liability for LWG and LWG Finishing's environmental liabilities also passed to HST, under *de facto* merger, mere continuation and fraudulent transaction theories. HST does not argue that LWG did not have environmental liabilities under CERCLA. Rather, HST argues that LWG Finishing cannot be held liable for the wrongdoings of its parent, LWG, and that, even if it could, HST is not the successor-in-liability to LWG Finishing.

The United States asks the Court to pierce the corporate veil under the factors enumerated in Belvedere Condominium Unit Owners' Association v. R.E. Roark Cos., 67 Ohio St.3d 274, 288, 617 N.E.2d 1075, 1086 (Ohio 1993), such that LWG Finishing may be held financially responsible for LWG's environmental liabilities. On the authority of Belvedere, the corporate form may be disregarded and individual shareholders held liable for the misdeeds of

22

the corporation in certain circumstances.  See id.[3]  Using the assets of a subsidiary such as LWG

Finishing to satisfy the debts of the shareholder parent corporation is sometimes called "reverse

piercing" of the corporate veil, whereas the typical veil piercing situation involves holding the

shareholder liable for the corporation's conduct.

Considerations somewhat different from those implicated by the use of traditional veil

piercing are implicated by the use of reverse veil piercing.  Judge Holschuh recently applied

Ohio law to pierce the corporate veil and impose CERCLA liability upon the "grandparent"

corporation of a subsidiary that had arranged for the disposal of hazardous materials.  See AT&T

Global Info. Solutions Co., 29 F. Supp. 2d at 866-69.  After considering the Belvedere factors,

Judge Holschuh reasoned, "[t]he costs of [the subsidiary's] actions should rightly be born by the

parent who controlled it, not plaintiffs."  Id. at 869.  However, reverse veil-piercing may impose

liability upon the controlled entity, not the controlling entity.  In many such cases, "innocent"

shareholders may be prejudiced by the imposition of liability, and in those cases courts may be

reluctant to pierce the corporate veil to impose liability on one corporation for the wrongdoings

of its parent.  See In re Colfor, Inc., Nos. 96-60306, 96-60307, 1997 WL 605100, at *4 (Bankr.

N.D. Ohio Sept. 4, 1997) (considering import of corporate veil piercing cases on issue of

substantive consolidation; "Unlike normal veil piercing cases, when a subsidiary corporation is

held liable for the debts of a parent, the interests of the subsidiary's third party non-culpable

---

[3]Under the Belvedere test, "the corporate form may be disregarded and individual shareholders held liable when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."  617 N.E.2d at 1086.

shareholders are improperly prejudiced"); <u>C.F. Trust, Inc. v. First Flight Ltd. P'ship</u>, 580 S.E.2d

806, 810 (Va. 2003) (noting that "a court considering reverse veil piercing must weigh the

impact of such action upon innocent investors"). <u>See also</u> <u>Stypula v. Chandler</u>, No. 2002-G-

2468, 2003 WL 22844296, at *3 (Ohio Ct. App. Nov. 26, 2003) ("<u>Belvedere</u> does not expose

innocent officers, directors, or shareholders of a corporation to liability when the corporate veil

is pierced," but "only those persons who actually exercise dominion and control to commit the

wrongful act may be held personally liable"). In this case, if LWG Finishing (and any successor)

could be held liable for the wrongs of LWG, individual shareholders who were not shareholders

of LWG, and in no way controlled LWG, such as Messrs. McFarland and Acree, could be

prejudiced. This is not an issue in traditional veil piercing, where the controlling person or entity

is held liable.

Perhaps because of these reasons, there appears to be no instance where a court has

applied Ohio law to pierce the corporate veil in reverse. In <u>Mathias v. Rosser</u>, Nos. 01AP-786,

01AP-770, 2002 WL 1066937, at *6 (Ohio Ct. App. May 30, 2002), cited by HST, the Court of

Appeals for the Tenth District concluded that the trial court had erred in holding that nursing

homes owned by an individual could be held liable as "alter egos" of that individual, because,

even if Ohio recognized reverse veil piercing, it would be inapplicable, since the plaintiff could

achieve virtually the same result by attaching the individual defendant's interest in the nursing

homes. Citing a dearth of case law, the court noted that Ohio is not among those jurisdictions

that have "actually adopted" the reverse veil piercing doctrine. <u>Id.</u> The United States cites

<u>Humitsch v. Collier</u>, No. 99-L-099, 2001 WL 20733 (Ohio Ct. App. Dec. 29, 2000), considered

by the court in <u>Mathias</u>. In <u>Humitsch</u>, the court merely noted that other jurisdictions had

employed the reverse veil piercing doctrine in limited circumstance but found the doctrine

inapplicable because, inter alia, the plaintiff had not presented evidence that the corporate

defendant was the alter ego of its sole shareholder, one of the individual debtors.  See Humitsch,

2001 WL 20733, at *4-5.  Another judge in this district made note of the theory of reverse veil

piercing in an opinion but, in light of the plaintiff's failure to cite any Ohio case law in support

of the theory, said that he felt "bound to follow Ohio law, not create it."  Winston v. Leak, 159 F.

Supp. 2d 1012, 1018 (S.D. Ohio 2001) (Marbley, J.)  Similarly, without authority under Ohio

law to do so, the Court will not employ a reverse veil piercing theory.  Since the United States'

theory of HST's liability admittedly depends on the ability to pierce the corporate veil between

LWG and LWG Finishing, HST is entitled to summary judgment on the United States' claims

against it.[4]


E.    Saundra Green

---

[4]HST does not explicitly argue for summary judgment on the ground that LWG Finishing is not the alter ego of LWG but focuses its argument that it is not LWG's successor on the point that HST's purchase of LWG Finishing's assets did not make HST the successor to LWG because "[t]he differences between the owners of LWG/LWG Finishing and HST are dramatic" and the asset purchase occurred before the United States notified Daniel of LWG's possible liability.  (Doc. #44 at 15.)  In fact, the United States argues that HST has conceded that LWG and LWG Finishing are alter egos, presumably by HST's use of the "LWG/LWG Finishing" shorthand.  (See doc. #57 at 2 n.1.)  However, HST vigorously and thoroughly contested the notion that LWG and LWG Finishing are alter egos in opposing the United States' motion for summary judgment.  (See doc. #50 at 4-11.)  HST makes the general argument in support of its motion for summary judgment that it is not LWG's successor, of which the argument regarding LWG's relationship to LWG Finishing is a subpart.  Moreover, the issue of whether LWG is the alter ego of LWG Finishing was thoroughly briefed on the United States' motion for summary judgment against HST.  A district court may grant summary judgment on a ground not explicitly raised by the movant where the non-movant has an opportunity to address the ground on which summary judgment is granted.  See Jacobs v. E.I. Du Pont De Nemours & Co., 67 F.3d 1219, 1243 (6th Cir. 1995).

Saundra Green moves for summary judgment on the United States' claims against her, arguing that they are time-barred.  In its complaint, the United States alleged that "[i]n approximately 1990," Daniel transferred certain assets to his wife, Saundra, and also stated on information and belief that Daniel may have made other asset transfers to his wife that might be discovered during the pendency of the action.  (Doc. #28 ¶ 35.)  Pursuant to § 3306(a) of the FDCPA, the United States requested 1) a declaration that those transfers were fraudulent conveyances with respect to Daniel's debt to the United States and therefore null and void to the extent necessary to satisfy Daniel's debt and 2) an award of remedy against the assets transferred or other property of the transferee necessary to satisfy Daniel's debt.  (Id. at 16.)  In her motion, Saundra argues that the FDCPA's statute of limitations ran before the United States filed its action and thus its claim against her is time-barred.

Under the FDCPA:

> A claim for relief with respect to a fraudulent transfer or obligation under this subchapter is extinguished unless action is brought –
>
> > (1) under section 3304(b)(1)(A) within 6 years after the transfer was made or the obligation was incurred or, if later, within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant;
> >
> > (2) under subsection (a)(1) or (b)(1)(B) of section 3304 within 6 years after the transfer was made or the obligation was incurred; or
> >
> > (3) under section 3304(a)(2) within 2 years after the transfer was made or the obligation was incurred.

28 U.S.C. § 3306(b).  Ms. Green submits that the United States makes claims against her under both subsection 3304(b)(1)(A) and subsection (b)(1)(B) of the FDCPA, a proposition that the United States does not dispute.  However, without conceding that Saundra would be entitled to

summary judgment at this juncture even if the FDCPA statute of limitations did apply, the

United States argues that § 3306(b) is inapplicable to its claims against Saundra.

The United States argues that CERCLA's statute of limitations applies rather than that of

the FDCPA.  The United States directs the Court to § 3001(b) of the FDCPA, which provides:

> To the extent that another Federal law specifies procedures for
> recovering on a claim or a judgment for a debt arising under such
> law, those procedures shall apply to such claim or judgment to the
> extent those procedures are inconsistent with this chapter.

28 U.S.C. § 3001(b).  The legislative history of FDCPA indicates that in drafting 28 U.S.C. §

3001(b) Congress had CERCLA in mind.  The House report accompanying the FDCPA bill

stated:

> if another federal law specifically provides other procedures for
> recovering debts or obtaining prejudgment remedies – such as the
> Superfund law, for example – those specific procedures shall
> continue to apply, rather than the procedures under this chapter.

H.R. Rep. No. 101-736, 101st Cong., 2d Sess. 28 (1990), reprinted in 1990 U.S.C.C.A.N. 6630,

6636.  However, this report only begs the question as to whether Congress intended to refer to

statutes of limitations in drafting § 3001(b).  United States v. Gelb, 783 F. Supp. 748, 757

(E.D.N.Y. 1991) suggests that this passage from the legislative history means that Congress did

intend to import CERCLA's statute of limitations; however, this discussion in Gelb is dicta – the

court had already determined that the action was governed by the FDCPA statute of limitations

and was timely, and merely made note of the FDCPA legislative history in terms of what

arguments "might" have been made by the government.

The United States notes that courts have routinely held that § 3001(b) precludes

application of FDCPA's statute of limitations to enforce federal tax liens, where the limitations

27

provision would be inconsistent with the ten year statute of limitations provided under the Internal Revenue Code.  See United States v. Letscher, 83 F. Supp. 2d 367, 378 (S.D.N.Y. 1999); United States v. Bantau, 907 F. Supp. 988, 990 (N.D. Tex. 1995); United States v. Werner, 857 F. Supp. 286, 289 (S.D.N.Y. 1994).  However, these cases are of limited value because another provision of the FDCPA makes clear that the FDCPA "shall not be construed to curtail or limit the right of the United States under any other Federal law or any State law . . . to collect     taxes. . . ." 28 U.S.C. § 3003(b)(1).  All of the opinions cited above relied on both § 3001(b) and § 3003(b)(1).  The inclusion of an explicit provision about statute of limitations in tax cases (and explicit provisions about other specific sorts of cases, as well, see, generally, 28 U.S.C. § 3003(b)) but not an explicit provision regarding the statute of limitations in CERCLA cases suggests that Congress did not intend for the CERCLA statute of limitations to trump the FDCPA statute of limitations.  Rather, the explicit provisions on statute of limitations suggest that Congress did not mean to refer to statutes of limitations at all in including § 3001(b).  To hold otherwise would render § 3003 unnecessary and redundant.

Finally, the United States protests that application of the FDCPA would bar the United States from obtaining potentially fraudulently transferred assets where the transfers were brought to the United States' attention before it completed its clean-up efforts and the CERCLA action thus became ripe.  Such a fairness argument is of no avail in this instance, where the FDCPA statute of limitations on a transfer that became known to the United States in 1996 would not have run before the United States' clean-up efforts at the Site were completed in 1997.

Although the Court concludes that the FDCPA statute of limitations, and not the CERCLA statute of limitations, applies to the United States' claim against Saundra here, the

28

Court will deny Saundra's motion for summary judgment. In its complaint, the United States states that Daniel may have made additional asset transfers to his wife other than those occurring in approximately 1990 that may be discovered during the pendency of the action. The United States seeks additional discovery to prove that such transfers occurred and would not be barred by the FDCPA statute of limitations. Saundra argues that the United States bears the burden of proof and thus it is incumbent upon the United States to produce evidence in response to her motion. However, discovery on asset transfers has been stayed until completion of the liability and costs phases, and this is an issue closely tied to asset transfers. Thus, summary judgment is not appropriate at this time.[5] Ms. Green may refile her motion after the close of discovery in "Phase III."

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES WITHOUT PREJUDICE** Defendant Saundra Green's Motion for Summary Judgment (doc. #42), **DENIES** Defendant L.W.G. Co., Inc. f/k/a Green Industries Inc.'s Motion for Summary Judgment (doc. #43), **GRANTS** Defendant Hard Surface Technology, Inc.'s Motion for Summary Judgment (doc. #44), and **DENIES** the United States' Motion for Partial Summary Judgment Against Hard Surface Technology as the Successor-in-Liability to L.W.G. Co., Inc./ L.W.G. Finishing Corp. (doc. #47). The Court also **GRANTS IN PART, DENIES IN PART AND HOLDS IN ABEYANCE IN PART** the United States' Motion for Partial Summary Judgment Against

---

[5]Saundra argues that the United States' request for more discovery is an admission that the United States improperly named her as a defendant without any evidence. However, the United States apparently was operating under the assumption that the CERCLA statute of limitations applied and thus its information and belief as to the occurrence of fraudulent transfers not barred by that statute of limitations was a sufficient basis to file.

L.W.G. Co., Inc., Daniel Green, and the Estate of Maurice Green (doc. #46), granting the United

States' motion as to LWG Co., Inc's liability, denying the motion as to Daniel Green's liability,

and holding the motion in abeyance as to the liability of the Estate of Maurice Green.  The Court

**ORDERS** the Estate of Maurice Green to show cause within thirty days of the entry of this order

why the United States' motion for summary judgment against it should not be granted for the

Estate's failure to respond.

      IT IS SO ORDERED.


                        ___s/Susan J. Dlott_____
                        Susan J. Dlott
                        United States District Judge