*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

## GREEN INDUSTRIES, INC. SUPERFUND SITE
### Record of Interview

| | |
|---|---|
| Witness: | Beverly Robin Grinstead |
| Address: | 3941 Cornell Road, Cincinnati, Ohio 45241 |
| Telephone: | (513) 769-4587 |
| Interviewed By: | Kimberly Zanier, Financial Analyst, NEIC |
| | Sally Jansen, Enforcement Specialist, Emergency Enforcement Support Section, Emergency Response Branch, Region 5 |
| | Reginald Arkell, Civil Investigator, OCEFT |
| Date of Interview: | March 18, 1999 |
| Location of Interview: | Ms. Grinstead's Residence |

Pursuant to a memorandum dated February 19, 1999, the Office of Regional Counsel (ORC), Region 5 requested civil investigative assistance from the OCEFT Civil Investigator Team and financial analysis from NEIC in the matter of the Green Industries Corporation Superfund Site ("the Site") in Sharonville, Ohio. U.S. EPA spent approximately $3 million to remediate uncontrolled hazardous materials abandoned at the Site. Previous activities at the Site include electroplating operations from approximately 1978-1995. Operators during this time were Creutz Plating Company which merged into Green Industries, Inc. ("GII"). GII continued plating operations until the Site and facility was sold to H.R.W. Industries, Inc. ("HRW") in 1988. HRW changed its name to Green Industries Corporation ("GIC") and continued electroplating operations until they filed for bankruptcy in 1995. Region 5 seeks assistance to gather information concerning liability, to verify financial information provided to date, and to investigate current finances of potentially responsible parties (PRPs). Reference is made to a proffer given by Beverly Robin Grinstead to the FBI and U.S. EPA Criminal Investigation Division (CID) on October 24, 1996. On March 12, 1999, CI Reginald Arkell contacted Beverly Robin Grinstead by telephone, identified himself as a representative of the U.S. EPA, and explained the subject case. He arranged to meet at her residence. On March 17,

R. Arkell's incorporation of S. Jansen's revisions to R. Arkell's original interview summary
05/06/99

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

1999, at 10:00 am, CI Arkell, Kimberly Zanier, Financial Analyst, NEIC, and Sally Jansen, Enforcement Specialist, Emergency Enforcement Support Section, Emergency Response Branch, presented official U.S. EPA credentials to Ms. Grinstead.

During the interview Ms. Grinstead frequently referred to copies of records she had obtained during her employment with companies owned and operated by Maurice and Daniel Green. She provided to the interviewers copies of her records that the FBI had returned to her. During the interview, Sally Jansen, in a call to Special Agent Tracey Heinlein at the Cincinnati office of the FBI, was able to confirm that the FBI had copied all of Ms. Grinstead documents so the set that she was giving to U.S. EPA was complete. Those records were not thoroughly reviewed at the time this report was written. The following information was obtained.

- Ms. Grinstead stated that she is a convicted felon and is currently serving 5 years probation which includes payments of $500.00 per month for embezzling $71,000.00 from GII and/or affiliated companies.

- Ms. Grinstead stated that Feinblanking Limited, Inc. ("Feinblanking") hired her in December, 1988, while LWG Company, Inc. (LWG), which had changed its name from GII, was setting up operations at its new facility at 9461 Le Saint Drive in Fairfield, Ohio. LWG was a dummy company. Dan Green started Norwood Hard Chrome at the same time as LWG. Ms. Grinstead had heard about the job from Tom Wanner, who had worked as an independent accountant for GII in Sharonville and for LWG. Maurice Green and Karl Keyes interviewed her. She worked as a bookkeeper and secretary. Ms. Grinstead said that she did not get along with Karl Keyes because of "stuff he did to Mr. Green." She remained with this company and/or other related firms including LWG Finishing Corporation ("LWG Finishing") and LWG Au Company ("LWG Au"), until about the middle of 1997. Norwood Hard Chrome did chrome plating which was subsequently done by LWG Finishing. LWG

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

Au did gold plating.

- According to Ms. Grinstead, Maurice Green and Mr. Keyes owned and operated Feinblanking which had moved from Toledo, Ohio, to the Le Saint Drive address prior to the sale of the Site. Feinblanking manufactures/stamps small automotive parts. Ms. Grinstead's understanding was that Maurice Green had bought the building and property at this location for about $1 million in about 1987. Feinblanking manufactures/stamps small automotive parts. Mr. Keyes wanted Maurice Green out of Feinblanking and this occurred about 2 years before Ms. Grinstead left or in about 1995. Much of LWG's initial plating business was conducted under the Feinblanking name. Ms. Grinstead was initially paid by Feinblanking where her duties included collections and invoicing until LWG was set up. Their accountants and/or lawyers had advised to keep operations separate because of the no-compete agreement. Her duties at LWG and the other associated companies included: accounts payable and receivable; calling payroll into ADP; maintaining general ledgers by hand, although some parts were later computerized; taking care of insurance; filling out deposit slips and making bank deposits; and general secretarial duties. She maintained separate accounting systems and transaction files for each company. She said there was frequent payments between the companies. She said she has some copies of the checks, some of the ledgers and financial statements. Ms. Grinstead said that LWG Finishing, Feinblanking, and Strong Manufacturing are still located at the Le Saint Drive location. Ray Acree keeps her updated with events there. Janie Wesley is still bookkeeper. Ms. Grinstead said she or Ms. Wesley took deposits for LWG, LWG Finishing, and LWG Au to the PNC Bank. Debbie Hargis worked for LWG on the side. Maurice Green bought her a "boob job".

- Ms. Grinstead indicated that Creutz Plating, Ziegler, Hard Chrome Plating, and Norwood Hard Chrome had all operated at a location on Dana Avenue prior to the Site at 3603 Kemper Road. William Korte, possibly associated with Provident Bank, may have been linked to the

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

sale of the Site from GII to GIC at Kemper Road. She was well aware that, pursuant to the terms of this sale, GII/LWG was not supposed to compete with GIC. However, Maurice Green and his son, Daniel Green, frequently discussed doing just that. They obtained a list of 250 customers of GIC and converted 91 of them to GII/LWG. Daniel Green, was also an owner/partner of GII, LWG, LWG Finishing Corp., and LWG Au and other possible affiliated companies at the Le Saint address. As part of the purchase agreement, he continued working for GIC as a consultant after the sale for about one year. Daniel Green gave Maurice Green daily reports concerning operations at GIC. Other former employees of GII such as Dem Phong and Ray Tinley continued their employment with GIC, acted as informants for the Greens concerning operations at GIC, and received cash payments from them for the information. These informants or Daniel Green were able to obtain financial statements for GIC. She heard this from Frank McFarland and Dale West. Eventually Ray Acree, Frank McFarland, and Dale West did things to get fired from GIC so they could work for LWG. They got paid under the table by Maurice. Dan was in on that. Ms. Grinstead said that Maurice and Daniel Green were the only owners of GII when it was located at the Site. Her understanding was that all assets of GII were sold to GIC. Accounting balances were not carried over to LWG from GII when the company left the Site. GIC eventually filed and won a lawsuit against GII for violating the terms of their agreement. Ms. Grinstead indicated that it was apparent that <u>Maurice and Daniel Green were aware of hazardous waste and contaminated soil at the Site</u> because she heard them talk about how they were supposed to clean up the outside but only cleaned up certain areas on the inside.

▸ Ms. Grinstead said that Bernard Harris, Donovan Rex, and Al Wagers were partners in GIC. She felt that Mr. Harris was aware of contamination at the Site because he had worked there for GII. Ms. Grinstead thought that GIC had obtained a loan from Provident Bank and possibly a second loan from Society Bank, NKA Key Bank. She thought that $1.9 million was financed by Society Bank. She believed that payment by the Greens to GIC as a result

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

of the lawsuit mainly went to help pay off the loan. She stated that GIC initially made monthly payments of about $4,500.00, for an amount they did not or could not finance, to GII for about one year or 15 months. These payments were checks made out to Maurice Green and sent by GIC to the Le Saint address. Ms. Grinstead said she deposited them into the personal account of Maurice Green. She recalled obtaining Dun & Bradstreet ("D&B") reports for GIC at the request of Maurice and Daniel Green. Ms. Grinstead recalled that D&B documented a price of $1,981,714.00 for the sale of the property and assets of the Site. She stated that Mr. Harris made monthly payments of about $25,000.00 for approximately one year to a "Rabbi Trust" which was controlled by Maurice and/or Daniel Green. Payments were apparently stopped after Mr. Rex indicated that he wanted this money back. Ms. Grinstead said Maurice Green was found to be in contempt of court for receiving these payments.

- She was aware from maintaining personal records of Maurice Green that his net worth was over $10 million. He utilized Provident Bank and then PNC Bank. She frequently made wire transfers for him all over the place from and to LWG and his personal accounts. Ms. Grinstead recalled many conversations she had with Delores Green, wife of Maurice Green. Apparently, Delores Green was always trying to identify assets because of their pending divorce. She said Delores Green obtained their home in Germany, another home in Indian Hill, and $600.00 per month alimony as part of the divorce settlement. Ms. Grinstead was familiar with the statement of affairs made by Maurice Green for the divorce settlement and said that it was not accurate. Ms. Grinstead has copies of records documenting these assets which were not in the statement of affairs. She said Maurice Green has two ex-wives by the name of Delores. One of them is his last wife, referred to above, who goes by the name of Dee. His first ex-wife is Jane. Ms. Grinstead provided an address of 4336 Glenway Avenue, Deer Park, Ohio for Dee Green. She said that Daniel Green was much more secretive about his personal financial accounts, however, she was able to look at certain financial and/or tax



*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

statements and could see that his four children had accounts of approximately $1.3 million each. Daniel Green's wife is Saundra Green. Neil Schulte did the tax returns for their children. Their accounts may have been at the First National Bank in Lebanon.

- Ms. Grinstead indicated that she frequently called an investment banker by the name of Tom Devitt with Keating, Muething & Klekamp. Maurice Green sent a check to them in the amount of $555,000.00 for an escrow account on August 17, 1989. Please see page 13 of the proffer report for further information concerning this money. She believes this was a focal point for an IRS investigation/audit. She was contacted frequently by the IRS for documents.

- Ms. Grinstead stated that Tom Wanner, a CPA and tax accountant who has his own business, was fired by Maurice and/or Daniel Green in about 1991 because he would not change something in the company books. She believed the company owed him $18,000.00 which he never received. Mr. Wanner worked for Feinblanking, LWG, GII, and Daniel and/or Maurice Green. She felt Mr. Wanner may be cooperative in the investigation. Al Wagers was an in-house accountant for GII before the company sale and GCI after the sale. He was also a partner in GCI. Neil Schulte was an independent accountant for Feinblanking, LWG, LWG Au, and LWG Finishing and Maurice Green, personally. Mr. Schulte had informed the Greens that they had to change the company name to LWG Finishing because of the lawsuit by GIC. She said this was not done for about 2 years or when Ms. Grinstead had been on the job for about five years. According to Ms. Grinstead, she maintained two sets of records each for LWG, LWG Au, and LWG Finishing Corp. pursuant to the directions of Maurice and Daniel Green. The obvious purpose of this was to hide receivables in the form of checks and cash which went to Maurice and Daniel Green's pockets and personal accounts. She said Tom Wanner and Neil Schulte would be key knowledgeable people as they did tax returns based upon records she kept. Originally, only Maurice Green had access to company financial accounts; however, Daniel Green gained access with the creation of

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

LWG Finishing Corp., which may have done business as Hard Surface Technology. She recalled a point when Daniel Green wanted to see all money going out, much of which went to their attorneys. Ms. Grinstead wrote checks out after going through bills and did wire transfers at the request of Maurice and Daniel Green.

- Ms. Grinstead stated that LWG Au initially had Maurice Green and Mark Endicott as partners/owners. The company existed for a time as MJK with Daniel Green, Mark Endicott and Marilyn Endicott as owners and deleting Maurice Green as he was ridding himself of assets. She said that Maurice Green sent Mr. Endicott to Austral-Calae in California to steal a gold plating formula. Mr. Endicott was also employed by this company. Dr. Satee was the contact at Austral-Calae and Ms. Grinstead made checks out to him. Ms. Grinstead said that Maurice Green was some kind of partner with Dr. Satee, but she does not have documentation of this. Ms. Grinstead recalled seeing invoices from this company and she transferred a lot of money by wire to them. LWG also received monetary wires for loan payments from Austral-Calae. She then made entries in the books. She said Maurice Green screwed over the owner of Austral-Calae, an Indian by the name of Dr. Satee, who had invented the gold formula.

- Ms. Grinstead indicated that Daniel Green used a truck on a Sunday to steal bar stock valued at approximately $300,000.00 from GIC. The bar stock had originally been sent from El-Star, Inc. to GIC. She provided a copy of a letter signed by LWG employees Dave Emo, Ray Acree, and Frank McFarland documenting this theft and apparently sent to Bernard Harris of GCI. To her knowledge, nothing was ever done about this theft. She thought this to be very strange and some possible indication that Mr. Harris and the Greens were involved in some type of illegal activity. In addition, receivables for GIC were deposited into accounts for GII. She also thought Mr. Harris and the Greens might be related. Apparently, Mr. Harris' partner, Donovan Rex, was furious and wanted to press charges. She said Mr. Rex

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

was an "outsider" while Mr. Harris had worked for GIC prior to the company sale. Mr. Rex ended up leaving GIC some time after Al Wagers did. Ms. Grinstead said the bar stock was put into a storage room at LWG. Mr. Emo may even have pictures of this. She said the Greens sold this material to companies named All-Type Hydraulics ("All Type") and Parker-Hannafin. Maurice Green created blank invoices to cover this bar stock which he maintained in a secure area. All-Type sent a number of checks made out to Maurice Green in unknown amounts as payment. All-Type had also disposed of hazardous waste for the Green's. Greg LNU of All-Type is a long time friend of Daniel Green.

- Ms. Grinstead said that Dave Emo was one of the top supervisors and a plant manager for GII/LWG Finishing and worked with the company for about 10 years before he was fired in about 1989 or 1990. Mr. Emo, Frank McFarland, Ray Acree, and Dale West were supposed to be partners/stockholders of LWG Finishing, but none of them were. During the year she left the company, they were listed by Neil Schulte on tax returns as stockholders of LWG Finishing. She said that they had never been listed before and they were not aware of such status. The latter three were fired by Bernie Harris from GIC. Mr. Emo has told her of hazardous waste being transported from the Site at night and on Sundays. Daniel Green even drove truckloads of material himself. Mr. Emo supervised Bernie Harris, Dale West, Frank McFarland, and Ray Acree. Mr. Emo and other employees at the Le Saint location have told Ms. Grinstead that customers frequently come to the plant and give cash to Daniel Green which he would put in his pocket. She figured it was because he gave these customers discounts.

- Ms. Grinstead indicated that Burt Signer owned and operated Manufacturing Technologies, which was also located at the Le Saint location. She made numerous wire transfers of money from LWG and associated companies and/or personal accounts of Maurice Green, at his request, to attorneys such as Gerald Lubitsky and Burt Signer. Mr. Lubitsky handled

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

Maurice Green's divorce case and the no-compete case, but he eventually lost his license to practice law and fled to Israel where money may be hidden in banks. Maurice Green said the payments were for consulting fees. Ms. Grinstead indicated that these amounts totaled hundreds of thousands of dollars and were too large and numerous for this. Another company attorney was David Hardway, 1420 Central Trust, Cincinnati, Ohio. He received much smaller payments but went nuts later. Ms. Grinstead said it was common for Maurice and Daniel Green to transfer money to other people who would then move it someplace else. Daniel Green used his mother, Jane, for these purposes.

- Ms. Grinstead stated that Sky Manufacturing, a lumber company which made pallets, was owned by Maurice Green, Larry Strong, and William L. Rose. Mr. Rose had originally owned the company but was forced out by the others. The business became Strong Manufacturing. Records are maintained by Jean Strong. The business operated out of one section of the Le Saint Drive location. Ms. Grinstead indicated that this company made payments to LWG, Norwood Hard Chrome, and LWG Finishing which was listed as rent. Maurice Green also received money on the side from them. The checks were cashed at PNC Bank. She made monetary wire transfers from the Green's companies at Le Saint Drive to Strong Manufacturing. Rent payments were subsequently made to Omni Properties, Inc. ("Omni") after they bought the Le Saint Drive location. She said that Daniel Green made deposits for Omni and took checks to Lebanon First National Bank. → *Does he have check writing ability ??*

- Ms. Grinstead said that in regards to two companies she had previously identified as associated with Burt and/or Neil Signer and as receiving loans from the Green's, Timberwood and Honeywood, are actually dummy corporations. Burt Signer actually lived on Timberwood.

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

- Ms. Grinstead stated that Samuel Green, brother of Daniel Green, bought the Le Saint Drive property through Omni from Maurice Green in about 1993. She did not know if any money changed hands in this transaction but said that Maurice Green had paid almost $1 million for the building in 1987. Ms. Grinstead displayed a copy of a deed showing transfer of the property from Sharonville Office and Industrial Park, LTD Partnership to LWG on February 12, 1991. She believes it is worth much more now unless contamination has altered its value. Equipment was brought from the Feinblanking plant in Toledo.

- Ms. Grinstead identified John Newman, Don Anten, and John Reherman as partners with Daniel Green in Afton Development Corporation. She said this company bought and sold a lot of property. She transferred money by wire from LWG and Daniel Green to this company. Mr. Rehrman is also a business partner with Daniel Green for Rumors Strip Club.

  [margin note: wire transfer]

- Ms. Grinstead indicated that Chemalytics was a company owned by Maurice Green and Dr. Ken P. Reed (Ph. D.). She said the Greens used this company for anything they wanted and Dr. Reed would agree. They kept Dr. Reed's signature on file. Further details are in the proffer report.

- Ms. Grinstead stated that Maurice Green traveled to Hawaii, California, and other unknown locations. He typically made his own travel plans; however, she was aware that he used Barney Rapp Travel, 431 E. Kemper Road in Springdale, Ohio. She said he has as many as 30 companies in California, Ohio, Kentucky, New Jersey, and New York.

- Maurice Green's girlfriend is Linda Wolfer. She created a company called LW/LS Wolfer. Ms. Grinstead has no idea what this company does but believes it may have assisted Feinblanking and/or other businesses at the Le Saint location in filling out invoices. She said Maurice Green may have gotten the son of Linda Wolfer, Greg Wolfer, a job with one of

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

their customers.

- According to Ms. Grinstead, LWG Finishing had six employees when she started and eight employees when she left. Maurice Green had authority to sign on the company accounts, however, this changed to Daniel Green at about the time LWG Finishing was created. She said Daniel Green was ultimately in charge of all operations. He acted as sales manager by taking orders from customers, maintaining a book of purchase orders and writing up work orders before giving them to employees for production, receiving cash from customers, checking each order before it went out, and directing all employees in their activities including hazardous waste disposal. Purchase or work orders were frequently just brief notes written by Daniel Green on a sheet of paper. He and/or Bill Sechrist boxed or packaged the product for shipment. Daniel Green gave her purchase orders every three days and she would type consecutively numbered invoices on the computer. Daniel Green would check the invoices before they were sent out. She maintained a file for each customer. She identified the following customer files in which invoices were removed by Daniel or Maurice Green, possibly because they paid in cash: All-Type; Parker-Hannifan; Sheffer (plant up the street; not related to Green's as far as Ms. Grinstead knows); Kustes; and JBK. Ms. Grinstead said that, although Maurice Green spent a lot of time at the plant, he did not really do anything. She said the other employees tended to have specialties each of them worked at most of the time in the plating operation, although Bob West, who came from GII, could perform all functions. These included welding, anodizing, and hard chrome plating. Dale West was a welder. Ray Acree specialized in a process which prepared surfaces. Bill Sechrist, Jim Bowman, and Frank McFarland were other employees. She said Dave Emo could give better details.

- Ms. Grinstead stated that Maurice and Daniel Green had a book to maintain corporate meeting minutes, however, they rarely used it as they did not really have any such meetings.

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

She said that the only things she recalled being in this book were documentation of a name change from Norwood Hard Chrome to LWG and a promissory note from LWG to Maurice Green. She said there were no other corporate formalities. Both Maurice and Daniel Green received routine payroll checks which were routed through ADP. Ms. Grinstead wrote out bonus checks for as much as $50,000.00 for them at their direction. She said Mr. Schulte would route these through ADP. Daniel and Maurice Green's base salaries were roughly $2,000.00 per week and $500.00 per week, respectively. Daniel Green would give himself and his dad periodic raises but there was not any formal vote for such salary increases. She was not aware of anything which documented their duties. Ms. Grinstead said that Daniel Green was very tight with his money. He maintained a small safe in his office which contained nothing but cash and was subsequently moved out, probably to his home. He also had a locked file cabinet in his office.

- Ms. Grinstead was only aware of the sale of the Le Saint Drive building to Omni from what Daniel Green had told her. She did not have to make any adjustment to the company books for this, although it is possible Mr. Schulte may have. Omni only existed as a deposit book. Mr. Grinstead indicated that the building does not have any mortgages or liens. The deed is probably in the company safe. The Omni account was at the First National Bank of Lebanon. Daniel Green had signature authority and signed everything for Omni, he maintained the checkbook for the Omni account, and deposited checks for it in the bank. Samuel Green never signs checks. He is never around and has lived in the Washington, D.C. and New Jersey areas. Ms. Grinstead believes that Mr. Keyes may have recorded the lease document as he always wanted to keep everything legitimate. He paid about $2,500.00 per month to Omni for Feinblanking. Ms. Grinstead wrote checks in the amount of $4,000.00 per month from LWG to Omni. Strong Manufacturing paid $500.00 per month to Omni for their lease.

*Attorney Work Product, FOIA Exempt*
*Investigator's Draft*

- Ms. Grinstead indicated that, at the direction of Maurice and Daniel Green, she wrote checks from LWG and Norwood Hard Chrome for many of their personal expenses like VISA (also First Card and AT&T Universal) and other bills documenting purchases, such as children's clothes, videos, and other expenses which obviously were not associated with the businesses. She maintained files for these personal accounts while she was working there. She recalled that, about one year before she left the company, Mr. Schulte told Maurice and Daniel Green to take care of personal bills from their own personal accounts.

- Ms. Grinstead is aware that Maurice Green had been serving five years probation for money laundering. She thought it might have resulted because of some business arrangement which went sour. She believes he may have kept documentation in a safe, however, he never talked about it.