**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:00-cv-637 |
| | ) | |
| Plaintiff, | ) | Judge Susan J. Dlott |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL GREEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**I.    Findings of Fact:**

**LWG Co., Inc.**

1.    LWG Company, Inc. ("LWG") owned and operated a plating facility at 3603 Kemper Road, Sharonville, Ohio (the "Sharonville Site") from 1981 through 1988.

2.    On or about May 1, 1988, LWG sold the Sharonville Site and most of its operating assets to an unrelated company called HOW Industries ("HOW"), which operated the facility under the name Green Industries Corp. ("GIC").

3.    In 1988, LWG purchased 9461 Le Saint Drive, Fairfield, Ohio (the "Fairfield Property") with the proceeds of its sale of the Sharonville Site.

4.    In 1989 and 1991, HOW/GIC filed two lawsuits in the Court of Common Pleas of Hamilton County against LWG and/or its principals (Daniel Green and Maurice Green) relating to the Sharonville Site in the Court of Common Pleas of Hamilton County.  Among other things,

the complaint in the 1991 lawsuit alleged that the LWG had illegally dumped chromic acid in two hidden sump holes at the Sharonville Site.

In 1988, LWG purchased 9461 Le Saint Drive, Fairfield, Ohio (the "Fairfield Property") with the proceeds of its sale of the Sharonville Site.

5. From at least 1988 onward, Daniel Green was the majority shareholder and President of LWG.

6. From at least 1988 onward, Daniel Green's father, Maurice Green, was a minority shareholder and an executive officer with LWG.

7. As majority shareholder and President, Daniel Green had legal control of LWG.

**LWG Mortgage on Fairfield Property:**

8. On September 6, 1991, LWG executed a promissory note in the amount of $640,000 with First National Bank of Warren County, secured by a first mortgage on the Fairfield Property. Both Daniel Green and Maurice Green executed the mortgage note and Repayment Agreement in their individual capacities and as officers of LWG (Daniel Green as President, Maurice Green as Secretary/Treasurer).

9. The loan was sought by LWG to fund the purchase of an appeal bond, because a judgment had been entered against LWG in one of the state court actions that GIC filed concerning the Sharonville Site.

**LWG's Environmental Liabilities:**

10.     As noted above, in 1991, HOW/GIC filed an action in state court that alleged, among other things, that LWG had illegally dumped chromic acid in two hidden sump holes at the Sharonville Site.

11.     On September 9, 1993, a plea agreement was entered by LWG and Maurice Green, by which LWG and Maurice Green agreed to plead guilty to the felony of having knowingly failed to evaluate waste that was generated at the Sharonville Site and disposed of at 1924 Dana Ave., Cincinnati, Ohio ("Dana Avenue Site") during 1981 and 1982, in violation of Ohio Admin. Code § 3745-52-11 and Ohio Rev. Code §§ 3734.11 and 3734.99.

12.     Pursuant to the September 9, 1993 plea agreement, Maurice Green received a two year suspended prison sentence and was placed on five years probation; and LWG and Maurice Green were required to clean up the Dana Avenue Site and reimburse the State of Ohio for its prior expenses relating to the matter.

**Omni Industrial Properties:**

13.     On September 9, 1993, Omni Industrial Properties, Inc. ("Omni") filed its Articles of Incorporation with the State of Ohio.

14.     Samuel Green has always been the sole officer, director, and shareholder of Omni.

15.     Samuel Green is the brother of Daniel Green and the son of Maurice Green.

16.     Samuel Green was 26 years old when Omni was incorporated and when LWG transferred the Fairfield Property to Omni.

17.     Omni's initial capitalization consisted of $500.00.

18. At the time Omni was incorporated and received the Fairfield Property, Samuel Green resided in New Jersey and was employed by Riva Financial Services managing debt acquired by that entity.

19. Omni has never had any employees.

20. Omni was incorporated for the purpose of acquiring the Fairfield Property.

21. The Fairfield Property is the only real property ever owned by Omni.

22. Omni's sole sources of income are rent paid by tenants of the Fairfield Property and bank account interest.

**Transfer of Fairfield Property:**

23. In April 1994, LWG transferred the Fairfield Property to Omni.

24. The Purchase and Sale Agreement for the Fairfield Property transfer, dated April 19, 1994, was signed by Daniel Green on behalf of LWG and Samuel Green on behalf of Omni. The sale price on the property was $631,500 to be paid by Omni's assumption of a $631,500 mortgage lien on the property to First National Bank of Warren County.

25. No money was paid by Omni to LWG in consideration for the Fairfield Property.

26. The Loan Agreement executed in conjunction with the transfer of the Fairfield Property states that LWG and, in their individual capacities, Daniel Green and Maurice Green remained liable to First National Bank for the approximately $631,500 indebtedness. The Loan Agreement was signed by Daniel Green, individually and on behalf of LWG; Maurice Green in his individual capacity; and Samuel Green, on behalf of Omni.

27.     While the Purchase and Sale Agreement provided subrogation rights to LWG against Omni with regard to the mortgage indebtedness, no subrogation rights were provided to Daniel Green or Maurice Green.

28.     The Loan Agreement obligated Omni to assign the rents collected from the Fairfield Property tenants to First National Bank.  The Loan Agreement further obligated Omni to open a savings account with First National Bank, deposit rents collected from the Fairfield Property tenants into the savings account, and execute an automatic payment agreement permitting the automatic payment of the loan from the savings account.

29.     Samuel Green was the sole individual involved in the acquisition of the Fairfield Property on behalf of Omni.  No attorneys, accountants, Realtors, or other agents were used by Omni for purposes of this transaction.

30.     In the Purchase Agreement, Omni assumed responsibility for the condition of the Fairfield Property, including any existing defects and the costs of environmental cleanup.

31.     Omni did not retain an environmental consultant to examine the Fairfield Property prior to acquisition.  Omni knew that LWG Finishing / Hard Surface Technology, an existing tenant at the property, was engaged in chrome plating and that chrome plating operations utilize the hazardous substance chromium.

32.     The transfer of the Fairfield Property was made at a time when LWG (and its principals, Daniel Green and Maurice Green) knew or should have known that LWG might be held liable for costs incurred by the United States for the cleanup of the Sharonville Site.

**Omni Post-Transfer:**

33.     At the time of the transfer, there were three tenants at the Fairfield Property: Hard Surface Technology; Feinblanking, Ltd.; and Strong Manufacturing.

34.     In 1994, Daniel Green owned 80% of the shares of Hard Surface Technology. Today, Daniel Green owns 90% of the shares of Hard Surface Technology.

35.     Maurice Green had a financial interest in Feinblanking, Ltd. and Strong Manufacturing. At some point during the late 1990's, Strong Manufacturing dissolved and ceased its tenancy, with Feinblanking expanding its lease to incorporate Strong Manufacturing's former space.

36.     Since the transfer of the Fairfield Property, Omni's rent collecting procedure has consisted of Daniel Green collecting rent checks from his company, Hard Surface Technology, as well as the other tenant(s) and depositing them at First National Bank on behalf of Omni.

37.     Omni's leases for the Fairfield Property provided for three five year tenancy increments. At the end of the first and second increments, the rent was to be increased by the growth in the consumer price index ("CPI") during that five year term. In 2003, Omni increased Feinblanking's rent by the percentage increase in CPI over the prior ten years (first and second increments). As a result, Feinblanking's annual rent was increased by $3,000.00.

38.     Omni has never sought a rent increase from Hard Surface Technology. Samuel Green declined to seek a rent increase from Hard Surface Technology in part due to concern for his brother Daniel Green resulting from Daniel Green's involvement in this litigation.

39.     Omni structured its Fairfield Property leases to be "true triple net leases" under which the tenants are responsible for the costs of the real estate, such as real estate taxes and costs of utilities.

40.     Pursuant to its lease with Omni, Hard Surface Technology is required to pay 50% of costs necessary to maintain the property in good order and condition, specifically including the roof.  Omni did not require payment of such costs from Hard Surface Technology when Omni had roof repairs made in the mid-1990s.

41.     Pursuant to its lease with Omni, Hard Surface Technology is required to pay all costs required to render the property free from hazardous substances and to return the property to Omni in "broom-clean" condition at the end of the lease.

**LWG Post-Transfer:**

42.     By 1995, LWG's sole "asset" was a note receivable from Maurice Green.  LWG ceased to operate in 1995.

**Loan Agreement Post-Transfer:**

43.     On September 19, 1996, the Loan Agreement with First National Bank was extended for an additional five year term.  The 1996 Loan Agreement was executed by Maurice Green and Daniel Green in their individual capacities, by Daniel Green on behalf of LWG, and by Samuel Green on behalf of Omni.

44.     Maurice Green died in 1999.

45.     On November 2, 2001, an appraisal conducted by Integra Realty Resources on behalf of First National Bank appraised the value of the Fairfield Property at $1.2 million.

46.     On November 15, 2001, the Loan Agreement was extended for an additional five year term.  The 2001 Loan Agreement was executed by Daniel Green in his individual capacity, by Daniel Green on behalf of LWG, and by Samuel Green on behalf of Omni.

**The United States' Claims Against LWG and Omni:**

47.  The U.S. Environmental Protection Agency ("EPA") assessed the Sharonville Site for environmental issues in 1995 and found abandoned and deteriorating plating lines containing chemical and plating wastes and abandoned and deteriorating drums containing acids, chemicals and waste sludges.  Inspectors also identified the interior walls, concrete flooring, and sewer system of the abandoned and deteriorating main building as being contaminated by hazardous substances.

48.  Through a contractor, EPA conducted various removal activities addressing environmental contamination at the Sharonville Site between March 1996 and August 1997.

49.  The United States filed suit against LWG and others seeking recovery of response costs that EPA incurred in connection with the Sharonville Site on August 4, 2000, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675.

50.  As of August 31, 2000, EPA had incurred $3,922,645.50 in unreimbursed response costs relating to the Sharonville Site.  EPA has incurred additional unreimbursed response costs since then, including enforcement costs and statutory prejudgment interest.

51.  In a July 8, 2004 Order, the Court entered partial summary judgment against LWG and held that LWG is jointly and severally liable to the United States under CERCLA for reimbursement of response costs associated with the Sharonville Site.

52.  As permitted by an Order entered on April 6, 2005, the United States filed a Third Amended Complaint on April 14, 2005, alleging that LWG fraudulently transferred the Fairfield Property to Omni, and seeking avoidance of that transfer under pertinent provisions of the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3304(b) and 3306.

**II.    Conclusions of Law**

**Fraudulent Transfers Under FDCPA Section 3304(b)**

53.    Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. § 3304(b)(1)(A), provides that a transfer made by a debtor is fraudulent as to a debt to the United States, regardless of whether the debt is incurred before or after the transfer is made, if the debtor makes the transfer with actual intent to hinder, delay, or defraud a creditor.

54.    FDCPA Section 3304(b)(2), 28 U.S.C. § 3304(b)(2), sets forth certain factors for consideration in determining "actual intent." These factors include

   (A)   the transfer . . . was to an insider;

   (B)   the debtor retained possession or control of the property transferred after the transfer;

   * * *

   (D)   before the transfer was made . . . the debtor had been sued or threatened with suit;

   (E)   the transfer was of substantially all of the debtor's assets;

   * * *

   (H)   the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;

   (I)   the debtor was insolvent or became insolvent shortly after the transfer was made . . . ;

   (J)   the transfer occurred shortly before or shortly after a substantial debt was incurred . . . .

28 U.S.C. § 3304(b)(2).

55.    The nature of establishing "actual intent" by direct proof may be difficult. Courts, therefore, "began long ago to look to inferences from the circumstances surrounding the

transaction and the relationship of the parties involved." See United States v. LaBine, 73 F. Supp. 2d 853, 858 (N.D. Ohio 1999), quoting Stein v. Brown, 480 N.E.2d 1121, 1124 (Ohio 1985); see also United States v. Leggett, 292 F.2d 423, 426-427 (6th Cir. 1961). Thus evidence of certain "badges" of fraud have generally been held sufficient to invalidate a transfer. LaBine, 73 F. Supp. 2d at 858-59. See also In re Phillips and Hornsby Litigation, 204 Fed. App'x. 398, 400-01 (5th Cir. 2006) (affirming grant of summary judgment where six badges listed in FDCPA Section 3304(b)(2) were shown).

56.   All eleven badges of fraud need not be evaluated. In FTC v. Nat'l Bus. Consultants, Inc., the Fifth Circuit Court of Appeals upheld a grant of summary judgment under FDCPA Section 3304(b)(1) based solely on two factors, that the transfer was to an insider and that the debtor retained possession or control of the of the property transferred after the transfer (28 U.S.C. § 3304(b)(2)(A) and (B)). 376 F.3d 317, 321 n.7 (5th Cir. 2004). See also FTC v. Mar Delfinas, Ltd., 68 Fed. App'x. 42, 43-44 (9th Cir. 2003) (summary judgment finding fraudulent transfer upheld where, *inter alia*, transfer was to an insider and debtor continued to control property and pay mortgage).

57.   FDCPA Section 3306, 28 U.S.C. § 3306, provides that the United States may obtain the following relief as a remedy for fraudulent transfers under 28 U.S.C. § 3304:

> (1)   avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
>
> (2)   a remedy under this chapter against the asset transferred or other property of the transferee; or
>
> (3)   any other relief the circumstances may require.

28 U.S.C. § 3306.

**Threshold Conclusions**

58.     The amount owed to the United States for response costs incurred in connection with the Sharonville Site constitutes a "debt" within the meaning of 28 U.S.C. § 3002(3).

59.     LWG is a "debtor" within the meaning of 28 U.S.C. § 3002(4).

60.     The conveyance of the Fairfield Property from LWG to Omni was a "transfer" of an "asset" within the meaning of 28 U.S.C. §§ 3301(2) and 3301(6).

**Conclusions Regarding the Transfer of the Fairfield Property from LWG to Omni**

61.     The transfer of the Fairfield Property from LWG to Omni was made with actual intent to hinder, delay, or defraud a creditor within the meaning of the FDCPA, 28 U.S.C. § 3304(b)(1)(A).  As set forth below, that conclusion is supported by the presence of several of the badges of fraud identified in the FDCPA, 28 U.S.C. § 3304(b)(2).

62.     The transfer was made to an insider.  In essence, Daniel Green transferred the bare legal title to the Fairfield Property to his brother, Samuel Green, and used LWG and Omni, as shell corporations to accomplish the transfer.  After the transfer, Daniel Green and LWG remained responsible for mortgage payments on the property and Daniel Green continued to collect rents and used them to make mortgage payments for the property.

63.     LWG (through its principal, Daniel Green) essentially retained possession or control of the Fairfield Property after the transfer.  After the transfer, Daniel Green and LWG remained responsible for mortgage payments on the property and Daniel Green continued to collect rents and used them to make mortgage payments for the property.

64.     LWG had been sued or threatened with suit before the transfer of the Fairfield Property to Omni was made.  On September 9, 1993 – the very day that Omni was incorporated

– LWG and Maurice Green agreed to plead guilty to the felony of having knowingly failed to evaluate waste that was generated at the Sharonville Site and disposed of at the Dana Avenue Site, and were required to clean up the Dana Avenue Site and reimburse associated costs incurred by the State of Ohio.  Thus, even by 1993, LWG and its principals could reasonably foresee that they would bear comparable liability for the Sharonville Site itself.

65.     The transfer was of substantially all of LWG's assets.  At the time of the transfer, LWG had essentially no assets other than the Fairfield Property.

66.     The value of the consideration received by LWG was not reasonably equivalent to the value of the Fairfield Property transferred to Omni.  The property was appraised at $1.2 million in 2001, and the original mortgage was only for $631,500, but Omni paid LWG nothing for the property.  LWG (and its principal, Daniel Green) also remained responsible for payment of the mortgage.

67.     LWG was insolvent or became insolvent shortly after the transfer was made.  After the transfer, LWG had no assets that could be used to satisfy its liabilities, including its mortgage indebtedness and its liabilities associated with the Sharonville Site.

68.     The transfer of the Fairfield Property occurred shortly before or shortly after a substantial debt was incurred by LWG.  The transfer occurred in April 1994, shortly after LWG was required to cleanup wastes from the Sharonville Site that were disposed of at the Dana Avenue Site, and shortly before EPA discovered the remaining environmental contamination at the Sharonville Site itself.

### **Ultimate Conclusions and Relief**

69.     LWG's transfer of the Fairfield Property to Omni was fraudulent as to a debt to the United States because LWG made the transfer with actual intent to hinder, delay, or defraud a creditor within the meaning of 28 U.S.C. § 3304(b)(1)(A).

70.     Pursuant to 28 U.S.C. § 3306(a)(1), the United States is entitled to entry of a judgment avoiding the transfer of the Fairfield Property from LWG to Omni, so that the Fairfield property can be used to satisfy LWG's CERCLA liability to the United States for the Sharonville Site, as established by the Court's prior Order on summary judgment.

71.     Pursuant to 28 U.S.C. § 3306(a)(3), the United States is entitled to any other relief the circumstances may require with respect to the fraudulent transfer of the Fairfield Property in order to satisfy LWG's CERCLA liability to the United States for the Sharonville Site, as established by the Court's prior Order on summary judgment.

*     *     *

Signature page for **United States' Proposed Findings of Fact and Conclusions of Law** in <u>United States v. Green, et al.</u>, Case No. 1:00-cv-637 (S.D. Ohio)

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: July 10, 2007 | RONALD J. TENPAS<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>United States Department of Justice |
|  |    s/ Randall M. Stone<br>RANDALL M. STONE, Senior Attorney<br>JEFFREY A. SPECTOR, Trial Attorney<br>Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 76ll<br>Washington, D.C. 20044-7611<br>Tel: (202) 514-1308<br>Fax: (202) 616-6584 |
|  | GREGORY G. LOCKHART<br>United States Attorney |
|  | GERALD F. KAMINSKI (OO12532)<br>Deputy Civil Chief<br>Office of the United States Attorney<br>221 East Fourth Street, Suite 400,<br>Cincinnati, OH 45202<br>Tel: (513) 684-3711<br>Fax: (513) 684-6710 |

OF COUNSEL:

RICHARD R. WAGNER
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604
(312) 886-7947

# CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing **UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to the following:

David A. Owen (dao@gdm.com)
Counsel for LWG Co., Inc. and Omni Industrial Properties, Inc.


Dated:  July 10, 2007                    s/ Randall M. Stone
                                         Randall M. Stone
                                         Senior Attorney
                                         Environmental Enforcement Section
                                         Environment and Natural Resources Division
                                         U.S. Department of Justice
                                         P.O. Box 76ll
                                         Washington, D.C.  20044-7611
                                         Tel: (202) 514-1308
                                         Fax: (202) 616-6584